**Harold MOEN, Plaintiff**

v.

**NORWEST BANK OF MINOT, Defendant.**

**Civ. No. A4–84–177.**

United States District Court,
D. North Dakota,
Northwestern Division.

Nov. 10, 1986.

Collin P. Dobrovolny, Minot, N.D., for plaintiff.

Thomas O. Smith, Bismarck, N.D., for defendant.

## MEMORANDUM OPINION

MAGILL, Circuit Judge, Sitting by Designation.

### I. INTRODUCTION.

In this diversity case,[1] Plaintiff Harold M. Moen ("Moen") alleges that Defendant Norwest Bank of Minot ("Norwest") allowed an unauthorized party to enter a safe deposit box Moen was renting, and that as a result Moen lost money. The task before this court is to determine whether Norwest breached the safe deposit contract, whether Norwest was negligent, and if so, what damages Moen has sustained. The court finds that Norwest breached the safe deposit contract and did so negligently, but that Moen has failed to prove damages.

### II. FACTS.

Moen, currently a resident of California, was from about 1950 to 1962 involved in oil venture investment. In the early 1950's he joined Russell Ballantyne and his brother Melvin W. Ballantyne ("Ballantynes"), and Theodore P. Clifford ("Clifford"), acquiring oil leases and royalty interests, buying and selling mineral interests, and obtaining venture capital to develop oil interests.

On February 13, 1962, Moen and the Ballantynes drafted a memorandum agreement, in which Moen agreed to sell real estate in Renville and Bottineau Counties, mineral interests and oil and gas leases in the United States and Canada, and oil company stock to the Ballantynes. On April 14, 1962, the deal was finalized through an Agreement for Sale and Purchase of Property ("Agreement").[2]

The consideration for the sale was $330,-000. The Ballantynes paid $500 down, with the rest to be paid in semi-annual payments of $25,000 plus interest up to and including the June 15, 1965 payment. After that date, the Agreement called for semi-annual payments of $20,000 plus interest.

The sixth paragraph of the Agreement was entitled "Escrow Agreement," and required Moen to prepare documents conveying his interest in the various properties to the Ballantynes, then deposit the documents in the American State Bank of Minot, which was to act as an escrow agent. On April 26, 1963, Moen and the Ballantynes replaced the sixth paragraph with a paragraph containing two major changes: Norwest replaced American State Bank of Minot as escrow agent, and a clause describing Norwest's liability was inserted. The new sixth paragraph stated in part:

> It is understood and agreed that the Vendors have executed to the Vendees instruments of Assignment and conveyances of the properties and interests in the properties as described in the attached exhibits and have deposited in a safety [sic] deposit box at First National Bank of Minot, North Dakota,[3] to be held in said safety deposit box until all sums due under this agreement for Sale and Purchase have been fully paid. It is further agreed that the key to said safety deposit box shall be delivered in escrow to the

---

1. The suit was initially brought in North Dakota state court and was removed to this court by Norwest. This court has jurisdiction pursuant to 28 U.S.C. § 1332.

2. At the same time, under an almost identical agreement, Clifford and his wife Helen sold their oil and gas interests in the United States

and Canada to the Ballantynes. That agreement has no bearing on this dispute, however.

3. First National Bank of Minot later changed its name to Norwest Bank of Minot. For clarity, the bank will be referred to throughout the discussion as "Norwest."

managing officer of the First National Bank in Minot, North Dakota, with the direction that the key may be delivered for repeated entries to said safety deposit box only to Harold Moen or Theo. P. Clifford and Melvin W. Ballantyne or Russell Ballantyne, it being the intention of the parties that one of the parties Harold Moen or Theo. P. Clifford and one of the parties Melvin W. Ballantyne or Russell Ballantyne be present at any time that the key is delivered by the managing officer of the bank. *It is agreed between the parties that the Bank shall be responsible for the contents of said safety deposit box only to the extent of cost of replacing any instruments therein, and in no event shall the liability of the Bank be more than $10,000.00* (Emphasis added).

Moen, Clifford, and the Ballantynes also drew up a document at this time, addressed to Norwest, which essentially reiterated the new sixth paragraph of the Agreement. In the document, the parties agreed to deliver to Norwest the keys to a Norwest safe deposit box [number 1771], to be held in escrow by Norwest's managing officer. The document directed the managing officer to give the keys only to Moen, Clifford, or the Ballantynes, and stated that it was "the intention of the undersigned that one of the parties, Harold Moen or Theo. P. Clifford together with one of the parties, Melvin W. Ballantyne or Russell Ballantyne be present whenever said key is delivered." It appears, however, that Moen and the Ballantynes each kept a key, and Norwest held only a master key.

The document then recited essentially the same exculpatory language as underlined above in the amendment to the Agreement, and also stated: "This escrow instrument shall terminate only upon a written terminating instrument executed by all of

the undersigned and delivered to you [Norwest]."

On May 10, 1963, pursuant to an additional agreement with Moen, the Ballantynes sold to ten oil companies the shares of oil company stock referenced in the Agreement. This transaction is not in dispute.

On May 16, 1963, pursuant to the Agreement, Moen rented safe deposit box number 1771 ("box number 1771") at Norwest. The safe deposit rental contract ("Rental Contract") contained a special notation as to box number 1771. This notation read:

> This box to be opened only in presence of Russell Ballantyne or Melvin Ballantyne and Theo P. Clifford or Harold Moen.

The United States property that Moen was to sell to the Ballantynes under the Agreement consisted of real estate deeds, a mineral deed, and four assignments of interest in oil and gas leases. These documents were placed in box number 1771.[4] The real estate deeds were subsequently disposed of,[5] and it is the mineral deed and four assignments of interest that are the subject of this dispute. The five properties are located in Bottineau County, North Dakota. The mineral deed, referred to by Moen as the "Kerr-McGee" interest, conveyed to the Ballantynes an "interest in and to all of the oil, gas and other minerals in and under and that may be produced from" a described parcel of land. The four assignments of interest in oil and gas leases, referred to by Moen as the "Albert Houmann # 1," "C. Houmann # 2," "C. Houmann # 3," and "Krogen" interests, each conveyed to the Ballantynes an "interest in and to the following described oil and gas lease * * * together with the rights incident thereto and the personal property thereon."

---

**4.** Similarly, the Canadian properties and interests were placed in a safe deposit box in the Bank of Montreal, Carnduff, Canada. The interests held in Canada are not in dispute, however.

**5.** On January 22, 1968, Moen and Melvin Ballantyne signed an admission card at Norwest

and were allowed access to box number 1771. Although not clear from the testimony, it appears that they removed the real estate deeds at this time, leaving only the mineral deed and four assignments of interest in oil and gas leases. As discussed, *infra*, Norwest claims that this entrance violated the Rental Contract.

All five properties (collectively, "mineral interests") produced oil and royalty income ("income") from oil production. The parties intended the Ballantynes to receive this income. Moen wrote to the oil companies operating the wells, directing them to make income payments directly to the Ballantynes.

Thus, under the Agreement, Norwest was to hold these assignments of mineral interests as an escrow agent until the parties had complied with all the terms of the Agreement. The Ballantynes were to pay all installments under the Agreement by deposit with Norwest, the escrow agent.

On June 26, 1964, Clifford died. In 1965, 1967, and 1968, Moen asserted that the Ballantynes were in default on the Agreement by having failed to pay the full installments due. Moen sent the Ballantynes several notices of default, then sent a "Final Notice" on September 3, 1968, which stated that all assignments of mineral interests held in escrow by Norwest were null and void. Moen also stated that he was directing the oil companies to stop sending income payments to the Ballantynes. Although in the "Final Notice" Moen purported to void the assignments of mineral interests, he continued to accept installment payments by the Ballantynes through June 15, 1969. Moen at no time notified Norwest of the alleged default.

On July 28, 1970, Moen notified Cardinal Petroleum, its successor Phillips Petroleum, and Kerr-McGee Petroleum that the Ballantynes were in default. Moen rescinded his previous authorization and requested that all income payments from the mineral interests be rerouted to Moen. For two years, until they verified that the Ballantynes were in default, the oil companies held income payments in suspense. Then, from October 13, 1972, through October 1, 1978, Moen received all income payments which, under the Agreement, were to have gone to the Ballantynes.

On August 11, 1978, Melvin Ballantyne and Helen Clifford, Clifford's widow, were admitted to box number 1771. Ballantyne removed everything in the box, which con-

sisted of the five Bottineau County assignments of mineral interests. Four days later, on August 15, 1978, these documents were recorded in the Bottineau County Register of Deeds Office. Within a few days, Moen learned that the documents in box number 1771 had been removed and recorded, and he notified Phillips and Kerr-McGee on October 17, 1978 that the documents' ownership was in dispute. Upon being notified, Phillips held all payments due on the mineral interests in escrow from October 1, 1978, through December of 1982. Kerr-McGee held all such payments in escrow from August of 1978 through March of 1983.

On June 2, 1983, Moen and the Ballantynes entered into a settlement agreement ("Settlement") regarding the funds held in escrow by Phillips and Kerr-McGee and the assignments of mineral interests. The Settlement incorporated by reference the original Agreement and called upon the parties to take action "to effect the transfer of properties and title pursuant to Exhibits 'A' and 'B'" (the memorandum agreement and formal Agreement). Under the Settlement, all income payments collected from June of 1969 through September of 1978 by Moen would belong entirely to Moen. All income payments from September of 1978 through December 31, 1982, would be divided equally 50 percent to Moen and 50 percent to the Ballantynes. The Ballantynes were given full title to the mineral interests effective January 1, 1983, together with all funds they had generated since January 1, 1983.

On June 17, 1983, Moen and the Ballantynes drafted an addendum to the Settlement, in which Moen reserved the right to sue, among others, Norwest and Helen Clifford and her heirs. The addendum also provided that the Settlement and addendum constituted a full release of the Ballantynes.

On December 7, 1983, Helen Clifford's son sent Moen a check for $10,000, in full settlement of any claims by Moen against the Cliffords resulting from the safe deposit box entry of August 11, 1978.

## III. PARTIES' ARGUMENTS.

The following claims and defenses emerged through the pleadings. Moen alleges that Norwest tortiously breached the safe deposit Rental Contract, creating a cause of action for negligence in tort as well as breach of contract. Norwest responds that it did not sign the Rental Contract it allegedly breached.

Moen claims that Norwest violated the duty of a depository in N.D.Cent.Code § 57–37.1–12, amounting to gross negligence. Norwest responds that section 57–37.1–12 was not enacted until 1975, after the events in dispute took place, and is thus inapplicable.

Moen contends that Norwest breached a fiduciary duty. Norwest responds that Moen, by his conduct, is estopped from claiming damages against Norwest and has waived the right to proceed against Norwest.

Moen claims damages in fees, costs and expenses of $6,000, loss of income and royalties from the five Bottineau County mineral interests of $42,500, loss of future income from these mineral interests of $240,000, and requests exemplary damages of $250,000. Norwest responds that Moen's right to recover any damages is limited by the terms of the Agreement, which gives Norwest third-party beneficiary status.

## IV. DISCUSSION.

The first issue for resolution is whether Moen may pursue both a breach of contract claim and a tort claim founded on negligence, or whether he is limited to one of the two.

The law on this issue is clear. "Courts often encounter cases in which both issues of tort and contract are presented to the trier of fact. * * * A jury may find for a party on each of two grounds: tort and contract." *Merrill Iron & Steel, Inc. v. Minn-Dak Seeds, Ltd.*, 334 N.W.2d 652, 656 (N.D.1983). Similarly, in *Hagert v. Hatton Commodities, Inc.*, 350 N.W.2d 591, 594 (N.D.1984), a case submitted to the jury on both tort and contract theories, the court stated: "Recovery can be sought on several theories or on alternative theories."

### A. Breach of the Safe Deposit Rental Contract.

Moen asserts that the typewritten part of the Rental Contract, which states:

This box to be opened only in presence of Russell Ballantyne or Melvin Ballantyne and Theo P. Clifford or Harold Moen

is inconsistent with printed Paragraph 8 of the Rental Contract, which states in part:

If two or more persons are named herein as Renter, this lease shall be deemed to effect for such persons a joint tenancy in the Safe and in this lease, with right of survivorship, and not a tenancy in common, but shall not, of itself, affect the title to any contents of the Safe. *Each of such persons alone may have access to the Safe,* appoint or revoke the appointment of any deputy, *exchange or surrender the Safe, terminate this lease and otherwise deal with the Safe or its contents the same as all of said persons together could do.* (Emphasis added).

Moen argues that because the two provisions are inconsistent, the typewritten part is controlling, citing N.D.Cent.Code § 9–07–16.

■ Norwest argues that when Melvin Ballantyne entered box number 1771 on August 11, 1978, he told Norwest that he was closing box number 1771 out and opening a new account, which was permissible pursuant to Paragraph 8 and not addressed by the typewritten part. This argument is untenable. The typewritten part is clearly addressed to any situation involving access to box number 1771. It defies logic to argue that the parties would have contemplated allowing one party alone to do something as drastic as close or modify the safe deposit box account, while at the same time requiring two parties simply to enter the box. This court finds that the typewritten and printed portions of the Rental Contract are inconsistent in this regard and that the typewritten part is controlling. *See Thiel Industries, Inc. v. Western Fire Insur-*

*ance Co.,* 289 N.W.2d 786, 788 (N.D.1980); *McGraw-Edison Co. v. Haverluk,* 130 N.W.2d 616, 620 (N.D.1964). The court therefore concludes that Norwest, by allowing Helen Clifford and Melvin Ballantyne into box number 1771 on August 11, 1978, breached the Rental Contract.

Norwest asserts, however, that Moen breached the Rental Contract first, because neither Moen nor Melvin Ballantyne notified Norwest, as required by Paragraph 8 of the Rental Contract, of Clifford's death before they entered box number 1771 on January 22, 1968. Paragraph 8 of the Rental Contract provides in part: "Each Renter hereby agrees that upon the death, bankruptcy or incapacity of any joint tenant, or of any other person having the right of access to such Safe, he will give the Bank written notice thereof before seeking further access to the Safe."

It is unclear, however, what Norwest asserts is the legal effect of Moen's breach. They raise that issue as a defense to the claim that they breached the Rental Contract. It thus appears that they contend that Moen's breach terminated the Rental Contract, or allowed Norwest to breach it as well.

■ Moen's breach would not, however, allow Norwest to cancel or rescind the Rental Contract. As Williston states:

> [Rescission] is not permitted for a slight, casual, or technical breach, but, as a general rule, only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract. Failure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient. (Footnotes omitted).

12 S. Williston, *A Treatise on the Law of Contracts* § 1467, pp. 188–89 (3d ed. 1970). Moen's breach does not rise to the level of

materiality contemplated for rescission, and thus cannot justify Norwest's breach.

■ The court finds, moreover, that despite Moen's failure to notify Norwest, Norwest did learn of Clifford's death before Helen Clifford and Melvin Ballantyne entered box number 1771 on August 11, 1978.

Thomas Stockert, Norwest's senior vice-president and cashier, testified by deposition that Norwest knew, prior to August 11, 1978, that Clifford was dead. Stockert also stated that Norwest had an established policy of reviewing obituary notices on a daily basis and cross-referencing the safe deposit boxes to those obituaries. Although Norwest knew Clifford was dead, Stockert stated that Norwest was justified in admitting Helen Clifford because Norwest's policy was to allow the executor of an estate access to the safe deposit box of the deceased.[6] In a letter to Moen's lawyer, Stockert wrote:

> The bank contends that they allowed access to these two parties [Melvin Ballantyne and Helen Clifford] as Helen Boyle Clifford was the heir of Theodore P. Clifford who passed away in 1964 and thus had inherited the total interest in his estate. * * * In 1978 we did allow the access to one Ballantyne and to Helen Boyle Clifford who we believe had the right to act for her deceased husband Theodore P. Clifford.

As Norwest knew of Clifford's death before August 11, 1978, Norwest also knew, or should have known, that Moen and Ballantyne had breached the Rental Contract by failing to notify Norwest of Clifford's death. Norwest did not, however, notify Moen or Ballantyne of the breach. Norwest continued to bill the original parties to the Rental Contract for use of box number 1771. Furthermore, by asserting that it was authorized to close out box number 1771 upon the order of Ballantyne alone, Norwest admits that it viewed the original Rental Contract as still in effect until the

---

**6.** Although Norwest took this position in letters to Moen and his lawyer, Norwest has not argued in its pleadings, brief, or at trial that Helen Clifford was authorized to enter box number 1771 on behalf of Clifford. This court therefore does not consider that issue.

time Ballantyne purported to close it. Norwest treated the Rental Contract as valid until Ballantyne purported to change it on August 11, 1978, and they cannot now assert otherwise.

### B. Tort in Negligence.

In *Layman v. Braunschweigische Maschinenbauanstalt, Inc.*, 343 N.W.2d 334, 341 (N.D.1983), the North Dakota Supreme Court set out the circumstances where a breach of contract involves a tort as well:

> The mere breach of a contract does not, by itself, furnish a basis for liability in tort for negligence; however, negligent conduct may be involved in the breach of a contract or, even if there has been no breach of contract, liability in tort for negligence may arise because of injury to persons resulting from negligence occurring in the course of performance of the contract. 65 C.J.S. *Negligence* § 4(6) (1966).

The section in Corpus Juris Secundum referred to states:

> [T]he same conduct may at times constitute a tort as well as a breach of contract. * * * Where the only relation between the parties is contractual, the liability of one to the other, in an action of tort for negligence, must arise out of some positive duty which the law imposes because of the relationship or because of the negligent manner in which some act which the contract provides for is done * * *. (Footnotes omitted).

Dean Prosser has summarized the law in this area as follows:

> The line of division which developed quite early was that between "nonfeasance," which meant not doing the thing at all, and "misfeasance," which meant doing it improperly. * * * In general, the courts have adhered to the line thus drawn * * *. The principle which seems to have emerged from the decisions in the United States is that there will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance without the contract—which is to say, whenever

such misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff. (Footnotes omitted).

Prosser and Keeton, *The Law of Torts* § 92, pp. 659–661 (5th ed. 1984).

Both parties characterize Norwest's status under these facts as that of a bailee for hire. It is noteworthy that Paragraph 12 of the Rental Contract states: "This lease shall not be construed to create any relation of bailor and bailee between the Renter and the Bank: the Bank has no knowledge of and exercises no supervision over articles deposited in the Safe." This apparent conflict in terminology does not create a problem, however, in view of the clear standard of care required by this situation.

The standard of care to measure Norwest's conduct is provided in N.D.Cent. Code § 60–01–11, which states: "A depositary for hire must use at least ordinary care for the preservation of the thing deposited."

"As applied to bailments, ordinary care means such care as ordinarily prudent men, as a class, would exercise in caring for their own property under like circumstances." *Reservation Motor Corp. v. Mayer*, 77 N.D. 431, 43 N.W.2d 537, 539 (1950). Moreover, the Rental Contract itself provides, in Paragraph 1:

> The sole liability of the Bank is to exercise reasonable care to prevent the opening of the Safe by any person other than the Renter or his duly authorized agent, or legal representative.

■ A cursory examination of the facts surrounding the entry into box number 1771 on August 11, 1978, reveals that Norwest failed to use reasonable or ordinary care. Veronica Filipek, the safe deposit clerk, testified that she allowed Melvin Ballantyne and Helen Clifford into box number 1771 because Ballantyne told her that Moen had nothing to do with the box anymore. Upon Ballantyne's instruction, she deleted Moen's name from the Rental Contract. She made no effort to check with Moen as to this change. She continued,

however, to bill Moen for box number 1771 through 1985.

Filipek stated that it was her duty to compare the signature on the admission slip with the one on the Rental Contract. Presumably at this time the clerk would notice any special conditions noted on the Rental Contract. This duty was obviously not followed. Although Filipek certified the box empty when she purported to re-rent it, she testified that she failed to check to actually see if the box was empty. The court concludes from the evidence present-ed that Norwest failed to exercise ordinary care over box number 1771, and that Moen thus has a cause of action in tort.

The court has examined Moen's addition-al claims and finds them to be without merit.

## V. DAMAGES.

Contract and tort actions require differ-ent damages.

> There is a clear distinction between the two theories of recovery "in that dam-ages not even anticipated are recoverable in tort, while only such damages as were reasonably contemplated by the parties at the time of entering into the agree-ment are recoverable for a breach [of contract]." 25 CJS Damages § 80 at 888 (1966); Section 32–03–09, NDCC (mea-sure of damages for breach of contract); Section 32–03–20, NDCC (measure of damages for tort).

*Merrill Iron & Steel, Inc. v. Minn-Dak Seeds, Ltd.*, 334 N.W.2d 652, 656 (N.D. 1983).

### A. Damages for Breach of Contract.

Norwest argues that the sixth paragraph of the Agreement, and the similar letter addressed to Norwest, both limiting Nor-west's liability to cost of duplication or replacement not to exceed $10,000, clearly shows the parties' intent as to the potential exposure and liability of Norwest. Nor-west argues that it is a third-party benefi-ciary of the documents.

■ Moen argues that Norwest was not a signator or party to either document, that the documents refer to duplication or re-placement of instruments, which was not possible under these facts, and that a con-tract exempting one from liability for negli-gence is against the policy of the law. Finally, Moen asserts that the clause limit-ing Norwest's liability represents liqui-dated damages. Moen argues that because the clause is not the result of a reasonable endeavor by the parties to fix their compen-sation, it is void and unenforceable. This court concludes, however, that the clause in both documents is a valid limitation of lia-bility in favor of a third-party beneficiary.

■ Moen cites *O'Connell v. Entertain-ment Enterprises, Inc.*, 317 N.W.2d 385 (N.D.1982) for the proposition that a con-tract must be made expressly for the bene-fit of a third party for third-party benefi-ciary status to apply, and that in this re-gard the parties' intentions are determina-tive. The *O'Connell* court stated:

> The power of a third-party beneficiary to enforce a contract is limited by Section 9–02–04 of the North Dakota Century Code, which provides:
>
>> "A contract made *expressly* for the benefit of a third person may be en-forced by him at any time before the parties thereto rescind it." (Emphasis added.)
>
> \* \* \* \* \* \*
>
> In order to determine whether or not the contracts at issue were made expressly for [Norwest's] benefit, we must look to the intentions of the parties to the con-tract. The intentions of the parties to a contract must be ascertained from the written contract alone, if possible \* \* \*.

*O'Connell*, 317 N.W.2d at 387–88. Applied to this case, the contract at issue was clear-ly "made expressly for the benefit of" Nor-west. Furthermore, the document ad-dressed to Norwest stated that only a "written terminating instrument" could ter-minate it. Such a terminating instrument was never drawn up or delivered to Nor-west.

Another guideline for determining whether a party is a third-party benefi-

ciary, as opposed to an incidental beneficiary, is whether the benefit to the third party was "within the contemplation" of the contracting parties. As stated in Court Syllabus No. 4 in *Farmers' State Bank of Gladstone v. Anton,* 51 N.D. 202, 199 N.W. 582 (1924):

> The mere fact that a third party may derive a benefit, purely incidental and not within the contemplation of the parties, from the performance of a contract, does not entitle him to maintain an action thereon in his own name within the provisions of [section 9–02–04], giving the beneficiary the right to enforce a contract made expressly for his benefit.

Again, it is clear through the documented language that a benefit to Norwest was "within the contemplation" of the contracting parties.

Although, as Moen points out, "the mention of one's name in an agreement does not give rise to a right to sue for enforcement of the agreement where that person is only incidentally benefited," *First Federal Savings and Loan Assoc. of Bismarck v. Compass Investments, Inc.,* 342 N.W.2d 214, 218 (N.D.1983), the court sees more than an incidental benefit to Norwest, and concludes that it is a third-party beneficiary.

■ Moen next asserts that a contract limiting liability is against public policy, citing N.D.Cent.Code §§ 9–08–02 and 9–08–04.[7] This court finds section 9–08–02 inapplicable, because the disputed provision does not exempt Norwest from liability, but delineates the scope of Norwest's potential liability. *See Roll v. Keller,* 336 N.W.2d 648, 650 (N.D.1983): "A stipulation *not to be held responsible* for any acts or torts in the future is against public policy and cannot withstand a legal test." (Em-

phasis added). Here, Norwest is still held responsible, but to a limited extent. Furthermore, the disputed provision does not attempt to exempt Norwest for "fraud," "willful injury," or "violation of law," as section 9–08–02 contemplates.

■ Moen next contends that the contract provision is invalid pursuant to section 9–08–04, governing liquidated damages, because the calculation of damages in this case is not impractical or difficult. This court doubts, however, whether that section is even applicable. The disputed provision does not purport to determine in anticipation of a breach the amount of damages, but rather, sets out the scope and extent of Norwest's responsibility over the items in the safe deposit box. No amount of damages is fixed in advance; rather, the provision appears to be a reasonable attempt to restore the Agreement to status quo in the event the documents were destroyed, by fire for example, or stolen. This court thus rejects Moen's argument that the provision is void as against public policy. *See* 10 Am.Jur.2d *Banks* § 478.

■ "Damages will not be presumed and must be proved." *Great Plains Supply Co. v. Mobil Oil Co.,* 172 N.W.2d 241, 250 (N.D.1969). Applying the terms of the sixth paragraph of the Agreement, this court finds that Moen has failed to adequately prove the cost of replacing the documents. In any event, replacing the documents would not be appropriate in this situation, a fact that Moen himself points out. The documents have not been lost or destroyed, the two events contemplating replacement. Moen and the Ballantynes have, through the Settlement, agreed to the disposition of the documents. They clearly know the documents' location and status. There is no need or reason to dupli-

---

7. **9–08–02. Contracts against the policy of the law.**—All contracts which have for their object, directly or indirectly, the exempting of anyone from responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.

**9–08–04. Fixing damages for breach void—Exception.**—Every contract by which the amount of damages to be paid, or other compensation to be made, for a breach of an obligation is determined in anticipation thereof is to that extent void, except that the parties may agree therein upon an amount presumed to be the damage sustained by a breach in cases where it would be impracticable or extremely difficult to fix the actual damage.

cate or replace the documents. Under these circumstances, this court concludes that Norwest incurs no damages for breach of the Rental Contract.[8]

### B. Damages in Tort.

The statute setting out the measure of damages for tort in North Dakota reads as follows:

> **32–03–20. Measure of damages for tort.** —For the breach of an obligation not arising from contract, the measure of damages, except when otherwise expressly provided by law, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.

This court finds that Moen has failed to adequately prove any damages arising in tort. The court further finds that Moen has waived his right to recover against Norwest in tort by entering the Settlement with the Ballantynes.

▮ Waiver is the voluntary abandonment of a known, existing right or claim which, except for the waiver, the party would have enjoyed. The voluntary and intentional relinquishment may be shown by agreement or by acts or conduct from which the intention to waive may be inferred. *Brunsdale v. Bagge,* 224 N.W.2d 384, 388 (N.D.1974).

Norwest argues that Moen could have sued the Ballantynes for a rescission of the Agreement and a cancellation of the documents in box number 1771, but that Moen chose instead to settle with the Ballan-

tynes, thereby voluntarily abandoning that right. Norwest claims that the damages Moen seeks are directly related to the Settlement.

Moen argues that *Bartels v. City of Williston,* 276 N.W.2d 113 (N.D.1979), dealing with percentages of fault attributable to joint tortfeasors, allows Moen to recover damages from Norwest despite the release of the Ballantynes. In *Bartels,* a passenger in a jeep was severely injured when the jeep went over a cliff and landed on its roof. The passenger gave a release to the driver and his insurance company, then brought a tort action against the City of Williston, which the passenger alleged was negligent in maintaining the crash site. The City of Williston brought a third-party action against the driver.

The North Dakota Supreme Court interpreted N.D.Cent.Code §§ 9–10–07 and 32–38–01 *et seq.,* on the issue of release and its effect on one of two tortfeasors, and dismissed the action against the driver. The *Bartels* court stated that where a plaintiff has in good faith given one of two joint tortfeasors a release, the factfinder shall determine the percentages of negligence attributable to both the released tortfeasor and the remaining tortfeasor. The damages against the remaining tortfeasor then shall be reduced by an amount proportionate to the percentage of negligence attributed to the released tortfeasor. Moen asserts that *Bartels* applies here, requiring this court to reduce Moen's recovery against Norwest by the percentage of neg-

---

8. It appears, in fact, that Moen was enriched as a result of the breach of the Rental Contract and subsequent Settlement with the Ballantynes. In the Settlement, Moen agreed to relinquish all right and title to the documents taken from box number 1771. In exchange, he received income payments from the mineral interests. Under both the Agreement and the Settlement, the Ballantynes received full title to the documents in box number 1771. Under the Agreement, Moen was to receive $330,000, of which he received, using his most conservative figure, approximately $290,000. Under the Settlement, Moen also received approximately $100,000 from having income payments rerouted to him. He also received $48,000, representing, pursuant to the Settlement, 50 percent of the payments accumu-

lated with the oil companies between September of 1978 and December 31, 1982. Moen also received $10,000 from Helen Clifford's son. Thus it appears that before the Settlement, Moen was, by his most pessimistic estimate, owed $39,000 on the Agreement. As a result of the Settlement, however, he realized a surplus of $119,000 over the $330,000 contemplated by the Agreement. The Settlement seems to take the form of a novation, "the substitution of a new obligation for an existing one." N.D.Cent. Code § 9–13–08. *See Herb Hill Insurance, Inc. v. Radtke,* 380 N.W.2d 651, 652 n. 1 (N.D.1986) for a clear discussion of novation; *see also North Dakota Public Service Commission v. Valley Farmers Bean Association,* 365 N.W.2d 528, 543 (N.D.1985).

ligence attributable to Melvin Ballantyne. The court finds *Bartels* inapplicable and rejects this argument.

 The source of Moen's claimed damages in this case is the loss of the documents in box number 1771. Moen claims, in short, that his documents of title, which were earning income and royalties for him and would continue to do so in the future, were wrongfully taken from him. When Moen transferred valid title in those documents to the Ballantynes, however, he no longer held any interest in those documents upon which to base a claim. In *Bartels*, the cause of action for negligence stood alone. Here, the cause of action for negligence is based upon negligent handling of what is, essentially, a property right. When Moen entered the Settlement, he gave up his interest in that property right, and thus cannot recover damages upon it.

## VI. COSTS.

N.D.Cent.Code § 28–26–06 provides that the clerk "must tax" certain disbursements in favor of the "prevailing party." Because Moen and Norwest have each prevailed on certain issues, the court finds that there is no single "prevailing party" against whom the clerk can tax disbursements. Moreover, N.D.Cent.Code § 28–26–10 provides for the discretionary awarding of costs for or against either party. Accordingly, this court rules that each party will bear their own costs. *See Liebelt v. Saby,* 279 N.W.2d 881, 888 (N.D. 1979).

LET JUDGMENT BE ENTERED ACCORDINGLY.

### JUDGMENT

This action came on for trial before the Court, Honorable Frank Magill, United States Circuit Judge sitting by designation, presiding, and the issues having been duly tried and a decision having been duly rendered,

It is Ordered and Adjudged that the plaintiff take nothing, that the action be dismissed on the merits, and that each party will bear his own costs of action.