**BITELER'S TOWER SERVICE, INC.,**
**Plaintiff and Appellant,**

v.

**Les GUDERIAN d.b.a. Guderian Broad-casting, Defendant and Appellee.**

**Civ. No. 900244.**

Supreme Court of North Dakota.

Feb. 22, 1991.

Gary S. Gronneberg, Gronneberg Law Office, Fargo, for plaintiff and appellant.

A.W. Stokes, Stokes Law Offices, Wahpeton, for defendant and appellee.

VANDE WALLE, Justice.

Biteler's Tower Service appealed from a judgment awarding Les Guderian $8,717.50 plus costs and disbursements on a counterclaim for damages arising from a breach of contract. We affirm the judgment.

Les Guderian is the sole owner of Guderian Broadcasting. In 1988, Guderian obtained approval from the Federal Communications Commission to operate an FM radio station in Wahpeton. Guderian sought price quotes for the construction of facilities which would meet FCC standards. On March 25, 1989, Guderian accepted a proposal prepared by Biteler's Tower Service (BTS) for the construction of a transmitting tower.

Under the terms of the contract, BTS agreed to furnish a 325–foot tower and all labor and equipment necessary to install the tower. Any additional work or hardware furnished by BTS which was not stated in the proposal required an additional fee and was to be agreed upon in writing. Guderian Broadcasting agreed to pay for a structural analysis and to pay Biteler $16,570.00. Guderian Broadcasting was to pay one-half of the amount upon acceptance of the proposal with the balance to be paid upon completion of the tower.

On April 4, 1989, Guderian executed a check for $8,285.00 paid to the order of BTS for one-half of the total amount due. Construction on the tower began April 17, 1989 and was completed May 12, 1989. During the construction phase, BTS requested that Guderian pay $1,725.00 for a structural analysis, $1,700.00 for guy wire and hardware, and an additional $1,000.00. On April 26, Guderian executed a check payable to BTS in the amount of $1,000.00 for "tower parts as per contract." On May 1, Guderian executed a check payable to BTS in the amount of $2,425.00 for "structural analysis—guy wire as per tower contract." On May 16, after construction had

been completed, Guderian executed a check payable to BTS in the amount of $4,142.50 "as per contract." On May 23, BTS billed Guderian an additional $1,103.56 for extra hardware and freight.

On May 30, 1989, BTS initiated a lawsuit against "Les Guderian, doing business under the firm and style name of Guderian Broadcasting" for breach of contract. BTS sought damages in the amount of $5,246.06 including $4,142.50 representing the unpaid balance under the contract and $1,103.56 for extra hardware and freight. Guderian filed a counterclaim alleging that BTS breached the contract and sought damages in excess of $10,000. The trial court determined that BTS had breached the contract by installing a 310-foot tower rather than a 325-foot tower, as provided for in the contract. BTS received nothing on its complaint and Guderian was awarded $8,717.50 in damages on his counterclaim. Additional facts will be presented and discussed more thoroughly below.

On appeal, BTS raises several issues and subissues. Many of these issues are either repetitive or inadequately developed and will be disposed of accordingly. The remaining relevant issues may be assembled into four discernible assignments of error. BTS asserts that the trial court erred in concluding that it had breached the contract; that the trial court erred in awarding Guderian damages on his counterclaim; that the trial court erred in not awarding BTS any damages on the original complaint; and finally, that the trial court erred in allowing the testimony of several of Guderian's witnesses.

In raising these issues, BTS has challenged several of the trial court's findings of fact and conclusions of law which we will discuss throughout this opinion. We note that on appeal conclusions of law are fully reviewable while findings of fact are not set aside unless they are clearly erroneous. *Norden Laboratories, Inc. v. Rotenberger*, 358 N.W.2d 518 (N.D.1984). A finding is clearly erroneous if it has no support in the evidence or if we are left with a firm conviction that a mistake has been made. *Miller Enterprises, Inc. v.*

*Dog N' Cat Pet Centers of America, Inc.*, 447 N.W.2d 639 (N.D.1989).

## BREACH OF CONTRACT

The tower installed by BTS was a "used" 310-foot tower which had been dismantled from its location near Fort Dodge, Iowa. BTS was required under the contract to install a 325-foot tower. The trial court found that the parties contemplated using the Fort Dodge tower. BTS contends that both parties mistakenly believed that the Fort Dodge tower was 325 feet and due to their mutual mistake "[t]he contractual obligation must be altered and reformed to be consistent with the mutual understanding of the parties."

■ Alteration of a contract and reformation of a contract are distinct legal principles. Alteration is a process wherein the parties make "[a] change in the provisions of a contract." Black's Law Dictionary 71 (5th ed. 1979). Reformation is an "[e]quitable remedy used to reframe written contracts to reflect accurately real agreement between contracting parties...." Black's Law Dictionary 1152 (5th ed. 1979).

Section 9–09–06, NDCC, governs the alteration of a contract and provides:

"A contract in writing may be altered by a contract in writing or by an executed oral agreement and not otherwise. An oral agreement is executed within the meaning of this section whenever the party performing has incurred a detriment which he was not obligated by the original contract to incur."

■ In the case at bar, the oral discussion of the Fort Dodge tower took place before the parties executed the written contract. The execution of a written contract supercedes all preceding oral negotiations. NDCC § 9–06–07. *See, Jorgensen v. Crow*, 466 N.W.2d 120 (N.D.1991). The written contract became the culmination of all prior agreements. *Rettig v. Taylor Public School District No. 3*, 211 N.W.2d 743 (N.D.1973). There existed no written contract which could have been altered by the parties at the time they contemplated the Fort Dodge tower. *See Rettig, supra.*

Further, as a general rule, a court cannot alter the provisions of an existing contract, but can only interpret a contract created by the parties. 17A C.J.S. *Contracts* § 296(3) (1963).

BTS argues that the contract should be reformed because a fair interpretation of its provisions may be accomplished only through a consideration of the real intention of the parties. In support of this proposition, BTS argues the application of section 9–07–05, NDCC, which provides:

"When through fraud, mistake, or accident a written contract fails to express the real intention of the parties, such intention is to be regarded and the erroneous parts of the writing disregarded."

Before we examine the parties' intentions under section 9–07–05, we must determine whether this case involves a relevant mistake of fact. Section 9–03–13, NDCC, provides the following definition for mistake of fact:

"Mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake and consisting in:

1. An unconcious ignorance or forgetfulness of a fact, past or present, material to the contract;

. . . . ."

The particular mistake of fact which BTS asserts triggers consideration of section 9–07–05 is that both parties believed the Fort Dodge tower to be 325 feet high. The trial court in its memorandum opinion does not indicate affirmatively that this was indeed a fact, but rather only found that both parties had contemplated using the Fort Dodge tower. Guderian testified that the use of the Fort Dodge tower had been considered previously when he was engaged in another venture. He further testified that an agent for BTS suggested that a used tower from its inventory would be installed at the Wahpeton site.

BTS's assertion that both parties mistakenly believed the Fort Dodge tower to be 325 feet is not significant. In order for this mistake of fact to be significant, it must be material to the contract. The height of the particular tower located in Fort Dodge was not material to the contract. The contract unambiguously required BTS to erect a 325–foot tower, notwithstanding the origin of that tower. If the Fort Dodge tower was not a 325–foot tower, it was BTS's obligation under the contract to secure a tower that met the contract specification. Because there has been no material mistake of fact, we need not apply section 9–07–05 to our analysis of this case. After a full review of the record and consideration of the assertions raised by BTS, we affirm the trial court's conclusion that BTS breached the contract.

## GUDERIAN'S DAMAGES

The next issue raised by BTS is whether the trial court properly awarded Guderian damages on his counterclaim. BTS challenges both the propriety of awarding damages to Guderian, personally, and the measure of damages utilized by the trial court.

BTS contends that Guderian Broadcasting, not Les Guderian, is the real party in interest. BTS argues that any damages established at trial were to corporate property, not personal property, and, therefore, Guderian's personal counterclaim must be dismissed. This issue was not raised, however, until a post-trial motion to amend the judgment. The trial court determined that the case had been completed and that BTS waived the right to raise that issue.

Rule 17(a), NDRCivP, sets forth the requirement that a party be a real party in interest and provides:

"(a) Real party in interest. Every action must be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought; and if a statute so provides, an action for the use or benefit of another must be brought in the name of the state of North Dakota. No action may be dismissed on the ground that it is not

prosecuted in the name of the real party in interest until a reasonable time has been allowed after the objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and the ratification, joinder, or substitution has the same effect as if the action had been commenced in the name of the real party in interest."

We will not speculate as to why BTS failed to object to Guderian as a real party in interest prior to judgment. However, the failure to raise this issue prior to entry of judgment precluded Guderian from obtaining ratification from Guderian Broadcasting or from joining Guderian Broadcasting as a party to the action, if necessary.[1] The purpose of Rule 17 is to avoid possible double liability, *E.E. Bach Millwork Co. v. Meisner & Co.*, 228 N.W.2d 904 (N.D.1975), not to avoid all liability by postponing a tactical objection to a possible procedural defect until such a time that the opposing party cannot implement a remedy prescribed under the Rule. Because the issue of whether Guderian was a real party in interest was belatedly raised, we hold that the trial court did not err in concluding that BTS waived the right to contest that issue. *See Farmers Elevator & Mercantile Co. v. Farm Builders, Inc.*, 432 N.W.2d 864 (N.D.1988) [trial court may refuse to consider alleged unconscionability of contract where the issue was first raised in a post-trial brief]; *see also Kirchoffner v. Quam*, 264 N.W.2d 203 (N.D.1978) [issues presented to the trial court for the first time in a post-trial motion are too late to be considered to make a new rule of law or to refine an existing rule].

■ BTS next contends that the trial court erred in calculating the amount of damages awarded to Guderian. The essence of the argument is that BTS substantially complied with the contract and therefore the trial court's award did not accurately reflect the actual damages sustained by Guderian. Substantial compliance does not, however, release a party from its obligation to respond in damages for injury resulting from a breach of contract. *All Seasons Water Users Assoc., Inc. v. Northern Improvement Co.*, 417 N.W.2d 831 (N.D.1988).

Section 32-03-09, NDCC, provides the measure of damages for breach of contract;

"For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by the laws of this state, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary sense of things would be likely to result therefrom. No damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin."

The parties in this case have submitted different theories on the proper measure of the detriment proximately caused by the breach. Although it is not clear from its argument, BTS apparently contends that the appropriate measure of damages should have been the difference in the value of a 325–foot radio tower and the 310–foot radio tower actually received. BTS asserts that the actual height of the tower installed was sufficient to maintain a connected antenna at such a height as to provide an adequate FM signal and to comply with FCC regulations. Therefore, Guderian suffered no injury resulting from the breach of contract. Guderian asserts that his detriment is properly measured by the amount of money it would cost to complete the contract (*i.e.*, adding 15 feet to the existing tower) plus any consequential damages. The trial court employed the cost of completion theory of recovery.

■ The measure of damages must be such to compensate the owner for injury resulting from omissions and derelictions in performance. *Shimek v. Vogel*, 105 N.W.2d 677 (N.D.1960). In *Karlinski v. P.R. & H. Lumber & Construction Co.*, 68 N.D. 522, 281 N.W. 898 (1938), this court

---

1. We presume ratification would have been easily obtained as Guderian was the sole owner of Guderian Broadcasting at the time of trial.

established the rule for properly measuring damages resulting from a breach of a construction contract:

"Where the contractor fails to keep his agreement, the measure of the employer's damages, whether sought in an independent action or by recoupment or counterclaim, is always the sum which will put him in as good a position as if the contract had been performed. If the defect is remediable from a practical standpoint, recovery generally will be based on the market price of completing or correcting the performance, and this will generally be shown by the cost of getting work done or completed by another person. If the defect is not thus remediable, damages are based on the difference between the value of the defective structure and that of the structure if properly completed." (Quoting Williston on Contracts, Rev. ed., § 1363.)

The purpose of the difference of value alternative is to avoid unreasonable economic waste when the destruction of usable property and subsequent reconstruction of property is necessary for completion in accordance with the construction contract. 5 Corbin on Contract, § 1090 (1964). The case at bar does not present such a situation. In this case, the defect (*i.e.* the tower being 15 feet too short) is effectively remedial. Darrell Biteler, owner of BTS, indicated at trial that tower sections could simply be added to the existing tower to bring it up to 325 feet. Absent unreasonable economic waste, we cannot say that the trial court abused its discretion in employing the cost of completion as a measure of damages.

BTS has spent considerable effort attempting to establish that there were no damages under the difference-of-value theory of recovery and little effort attacking the damages actually awarded under the cost of completion theory. BTS does argue that Guderian "failed to take any measures to minimize damages, if any, and no damages should be awarded." BTS offers no support for this general assertion other than a citation to *Wrangham v. Tebelius*, 231 N.W.2d 753 (N.D.1975). *Wrangham*, a case arising from an alienation of affec-

tions claim, may be distinguished on the grounds that it has does not involve contractual damages nor the mitigation thereof. In light of the inadequate development of this argument, we deem it without merit.

■ BTS next argues that the trial court erred in awarding costs to Guderian because neither party was the prevailing party. Section 28–26–06, NDCC, requires the clerk to tax as part of the judgment the necessary disbursements of the prevailing party. When each party has prevailed on certain issues, however, there is no prevailing party against whom the clerk can tax disbursements. *Liebelt v. Saby*, 279 N.W.2d 881 (N.D.1979). *Accord Moen v. Norwest Bank*, 647 F.Supp. 1333 (D.N.D. 1986). In this case, the trial court properly set off $2,242.50, which Guderian was obligated to pay BTS had the contract been completed, from the $10,960.00 BTS owed Guderian for cost of completion damages. Guderian's obligation to BTS, had BTS completed performance, was not an issue in this case. Thus, BTS did not prevail on that issue and cannot be deemed a prevailing party. Therefore, the trial court did not err in awarding costs and disbursements to Guderian.

## BTS'S DAMAGES

■ BTS asserts that Guderian owes $5,246.06 on the original contract and on subsequent oral agreements. That total includes $200.00 which the trial court found BTS had overcharged Guderian for a structural analysis and which finding BTS does not challenge on appeal. That total also includes the $2,242.50 which remains unpaid from the original written contract and which the trial court properly set off against the damages awarded to Guderian. BTS asserts that the remaining $2,803.56 is the balance due under oral agreements providing that BTS was to be reimbursed for supplying additional guy wire and hardware which was not contemplated by the parties when entering the written contract.

The written contract provided that any additional hardware or work supplied by

BTS would require an additional fee and would be agreed upon in writing before the hardware or work was supplied. A provision in a written contract which requires any changes to the contract to be in writing may be waived by an executed oral agreement. NDCC § 9–09–06; *Shimek v. Vogel, supra.* However, under section 9–09–06 an oral agreement is not executed until "the party performing has incurred a detriment which he was not obligated by the original contract to incur."

David Biteler, whose office drafted the contract, testified that the contract required BTS to install the tower in an upright position and provide all labor and equipment necessary for installation. He further testified that installation necessarily requires guy wire and other hardware, such as anchors. Thus, under the contract, BTS was required to furnish the hardware necessary to install the tower and incurred no detriment which it was not obligated by the original contract to incur. Therefore, there has been no executed oral agreement to waive the provision in the written contract requiring that additional hardware be agreed upon in writing. Because there was no subsequent written agreement providing for an additional fee for additional hardware, the trial court did not err in refusing BTS's claim for damages.

## EXPERT TESTIMONY

■ The final issue raised by BTS is whether the trial court erred in admitting the testimony of several of Guderian's witnesses. First, BTS asserts that the trial court erred in admitting the testimony of Steven Ackerman. Ackerman, a private consultant in a land surveying business, testified as to the actual height of the tower. BTS, however, made no objection at trial to Ackerman's testimony and therefore has not preserved this matter as an issue on appeal. *See Besette v. Enderlin School District No. 22,* 310 N.W.2d 759 (N.D.1981).

■ Second, BTS asserts that the trial court erred in admitting the testimony of Timothy Rajkowski, owner of Tim's Tower Service. Rajkowski testified as to the cost of raising the tower from 310 feet to 325 feet. BTS claims his testimony was a surprise because pretrial discovery indicated that Rajkowski would testify as to the cost of raising the tower 25 feet. BTS knew the substance of the testimony prior to trial and cannot claim harm from an estimate which was actually less than the pretrial estimate.

■ Finally, BTS asserts that the trial court erred in admitting the testimony of Garrett Lysiak, a consulting engineer. In particular, Biteler objects to the introduction of Lysiak's opinion on the difference between a 310–foot tower with a 300–foot antenna and a 325–foot tower with a 315–foot antenna BTS argues that this testimony should have been excluded because it was expert testimony not disclosed prior to trial. Despite a timely objection, the trial court allowed the testimony, noting that this was a bench trial and that it may not consider the testimony which was not previously disclosed. This court has stated that the introduction of allegedly inadmissible evidence in a bench trial will rarely be grounds for reversal. *Signal Drilling Co. v. Liberty Petroleum Co.,* 226 N.W.2d 148 (N.D.1975). In this case, the testimony went to the possible loss of coverage resulting from a shorter tower. The trial court did not award damages for loss of coverage, however, but only for completion of the contract. Therefore, any error in admitting the testimony was harmless.

The judgment of the district court is affirmed.

ERICKSTAD, C.J., and LEVINE, MESCHKE and GIERKE, JJ., concur.